***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. At all relevant times, defendant-employer was subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between Leroy Douglas, Jr. (hereinafter "decedent") and defendant-employer on September 19, 1985, the date of the compensable injury by accident resulting in quadriplegia of decedent.
3. Liberty Mutual Insurance Company was the carrier on the risk.
4. Defendants admit decedent sustained compensable injuries as a result of a motor vehicle accident, which occurred on September 19, 1985.
5. At the time of the accident, decedent earned an average weekly wage of $411.20, yielding a compensation rate of $280.00.
6. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1 — Certificate of Death for decedent
b. Stipulated Exhibit #2 — Report of Autopsy Exam
c. Stipulated Exhibit #3 — Medical records of Cynthia Booker-Douglas
d. Stipulated Exhibit #4 — Interdisciplinary Plan of Care
e. Stipulated Exhibit #5 — Marriage Certificate Stipulated Exhibit #6 — Industrial Commission Forms
7. Plaintiff's motion to admit additional evidence of the Social Security Administration documents is allowed and these documents are received into the evidence of record.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. On September 19, 1985, decedent was employed by defendant-employer as a truck driver. Decedent worked for defendant-employer for one week when he was involved in a motor vehicle accident that left him seriously injured.
2. On September 19, 1985, decedent was asleep in the passenger seat of a long-distance truck when his team driver reached for a soft drink and lost control of the steering wheel while traveling in Sallisaw, Oklahoma. The truck ran off the side of the road and flipped on its side. Decedent sustained a C4 fracture to his spinal cord, which rendered him immediately quadriplegic. Decedent was placed in cervical traction and required artificial ventilation for several days. Decedent's condition was complicated by upper gastrointestinal bleeding that required an emergency laparotomy with oversewing of a posterior wall stress ulcer, vagotomy, antrectomy, and gastroduodenostomy. One month later, decedent underwent application of a halo vest with cervical spine alignment. On November 18, 1985, decedent was determined to be medically stable and he was transferred to the Whitaker Center for Rehabilitation in Winston-Salem, North Carolina.
3. Decedent was discharged from the Whitaker Center for Rehabilitation on March 21, 1986. Defendants provided attendant care for decedent from March 21, 1986 until his death on April 6, 2001. Due to decedent's quadriplegia from the chest down, decedent required a power wheelchair and defendants purchased a van with a hydraulic lift for decedent's transportation. Decedent received ongoing medical care and monitoring through the date of his death from urologist Dr. Frederic Reid, neurosurgeon Dr. David Kelly, rehabilitation specialist Dr. James McLean, and podiatrist Dr. Walter Zelasko.
4. After years of rehabilitation, decedent became very high functioning. Decedent learned to drive a specially equipped van purchased for him by defendants. In March 1993, decedent enrolled at Good Will Industries Rehabilitation Center in Greensboro, North Carolina, where he was a part of a job training program for the disabled and disadvantaged. By July 1993, decedent obtained a job with Sears Teleservice Center where he was employed part-time for 15 to 20 hours per week and earned wages as a service consultant. After decedent returned to work, defendants continued to pay decedent full indemnity benefits of $280.00 per week.
5. From the date of decedent's accident through October 6, 1994, decedent received temporary total disability benefits. Thereafter, defendant-carrier attempted to change the classification of decedent's benefits. Decedent began receiving what the carrier designated as permanent total disability benefits on October 7, 1994 and he continued to receive those benefits through his death on April 6, 2001.
6. Defendants have not filed a Form 21, Form 26 or any other Industrial Commission form for the payment of temporary total disability benefits. No form agreement was ever approved by the Industrial Commission. The changing of defendants' internal classification of the benefits being paid to decedent did not constitute a final determination of the disability of decedent. Therefore, there was no final determination of disability regarding decedent by the Industrial Commission prior to the Deputy Commissioner's hearing.
7. When decedent was discharged from the Whitaker Center for Rehabilitation in March 1986, certified nursing assistants or family members initially provided attendant care for decedent. In August 1991, plaintiff began working part-time as decedent's certified nursing assistant. In 1995, decedent moved from High Point to Greensboro. After decedent's move, plaintiff became his sole caregiver, providing care for decedent twenty-four hours per day, seven days per week. Defendant-carrier paid plaintiff $1,517.40 per week for her services. On November 8, 1997, decedent and plaintiff were married.
8. On April 6, 2001, decedent was found dead in his wheelchair. An autopsy was performed on April 9, 2001, which determined that decedent died of hypertrophic heart disease. Dr. Sewell Dixon, a cardiovascular surgeon, defined hypertrophic heart disease as the enlargement of the heart. Although Dr. Dixon never examined decedent, he reviewed a complete set of decedent's medical and rehabilitation records, the autopsy report, and the death certificate, among other documents, to render an opinion about the cause of decedent's death.
9. During his deposition, Dr. Dixon was questioned about his expert opinion whether there was a causal relationship between decedent's death and either his quadriplegia or his compensable workers' compensation injury. Dr. Dixon testified that decedent falls into the category of individuals who die of sudden cardiac death. Dr. Dixon stated that the predominant cause of sudden cardiac death is coronary heart disease. Decedent's autopsy, however, revealed no evidence of coronary heart disease or atherosclerosis. Sudden cardiac death can also be caused by the existence of a pulmonary embolism. Pulmonary embolism was ruled out as a cause of decedent's death since there was no blood clot found in decedent's lungs during the autopsy. Another cause of sudden cardiac death involves cardiomyopathy, defined as an abnormality of the muscle of the heart, a consequence of which is enlargement of the heart. During decedent's autopsy, decedent was found to have hypertrophic heart disease or an enlarged heart. Dr. Dixon stated that decedent's enlargement of the heart was not related to either his quadriplegia or his initial compensable accident. Dr. Dixon testified, "the usual finding in a patient with quadriplegia is a heart that's atrophied, that's actually smaller." Dr. Dixon further remarked that fatal arrhythmias are the leading cause of death for all individuals in the United States. Dr. Dixon stated to a reasonable degree of medical certainty and the Full Commission finds as fact that decedent died of a fatal arrhythmia due to an enlarged heart that was caused by cardiomyopathy, and that there was no causal relationship between the cardiomyopathy and decedent's quadriplegia or his compensable injury.
10. Plaintiff contends that defendants had a responsibility to provide cardiac monitoring as a part of decedent's care, and had they done so, decedent would have known about his heart condition in time to receive treatment that could have prevented his death. Decedent, however, in the 1985 accident sustained a spinal cord injury for which defendants were responsible for treating. Absent a causal relationship between this injury and a heart condition, defendants had no obligation by law or otherwise to provide cardiac monitoring.
11. Plaintiff claims that she was physically and/or mentally disabled and unable to support herself as of the date of decedent's death. On January 13, 1997, plaintiff was rear-ended while sitting in her vehicle at a stoplight in Greensboro. On May 15, 1997, plaintiff began treatment with Dr. Victoria Neave, a neurologist, for complaints of increasing headaches and vertigo, among other symptoms. Dr. Neave determined that plaintiff had a congenital arachnoid cyst with which she was likely born. The cyst had hemorrhaged after the accident and enlarged over time. On May 16, 1997, surgery was performed to excise the cyst. Plaintiff was discharged from the hospital shortly thereafter and returned home to care for decedent. On October 18, 1999, plaintiff was involved in a second motor vehicle accident. Plaintiff was diagnosed with hydrocephalus and on October 17, 2000, plaintiff had surgery to implant a shunt in her head to drain the re-expanded cyst. Dr. Neave did not state that plaintiff was disabled or incapable of earning any wages. The only time plaintiff was limited in any capacity was immediately after both surgeries, but only for a short period of time.
12. As of the date of decedent's death, plaintiff was no longer under Dr. Neave's care and was performing all of her duties as decedent's certified nursing assistant. The duties plaintiff performed included, but were not limited to, getting decedent out of bed, showering and dressing him, cleaning his house and preparing his meals, transferring him from and to his wheelchair, and driving him wherever he needed to go. From the time plaintiff became decedent's full-time caregiver in 1995 through the date of decedent's death, plaintiff received $1,517.40 per week in attendant care benefits from defendants. By accepting compensation from defendants and by continuing to provide around-the-clock care for decedent up until the time of his death, plaintiff showed that she was capable of earning the same wages as she did prior to either of her two motor vehicle accidents, and was therefore not disabled.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The first step in establishing entitlement to death benefits pursuant to N.C. Gen. Stat. § 97-38 is to determine whether decedent's death was causally related to the spinal cord injury he sustained in the September 19, 1985 accident. N.C. Gen. Stat. § 97-38 states:
 If death results proximately from a compensable injury or occupational disease and within six years thereafter, or within two years of the final determination of disability, whichever is later, the employer shall pay or cause to be paid, subject to the provisions of other sections of this Article, weekly payments of compensation equal to sixty-six and two-thirds percent of the average weekly wages of the deceased employee at the time of the accident . . .
2. The first requirement of the statute is that the deceased employee's death must have proximately resulted from a compensable injury. Decedent's death from hypertrophic heart disease did not proximately result from his quadriplegia or his workers' compensation injury sustained on September 19, 1985. N.C. Gen. Stat. § 97-38. Decedent died from sudden cardiac death brought on by cardiomyopathy and that did not proximately result from decedent's original injury. Decedent was at the same risk of dying from heart disease as any other person. Accordingly, plaintiff is not entitled to death benefits pursuant to N.C. Gen. Stat. § 97-38.
2. Assuming arguendo that decedent's death from hypertrophic heart disease proximately resulted from the injury sustained in the September 19, 1985 accident, decedent's death did not occur within six years of the accident. N.C. Gen. Stat. § 97-38. However, decedent's death occurred within two years of the final determination of disability, since prior to the time of the hearing, no such final determination of disability had been made. Id.
3. Again, assuming arguendo, if the Commission were to find that plaintiff is entitled to death benefits, as decedent's surviving spouse plaintiff would be entitled to 400 weeks of death benefits. Plaintiff, however, would not be entitled to lifetime benefits as she was not physically or mentally disabled at the time of decedent's death on April 6, 2001, nor was she dependent upon decedent for support. N.C. Gen. Stat. § 97-38.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for death benefits pursuant to N.C. Gen. Stat. § 97-38 is hereby DENIED.
2. Plaintiff's claim for burial expenses pursuant to N.C. Gen. Stat. § 97-38 is hereby DENIED.
3. Plaintiff's claim for attorney's fees is hereby DENIED.
4. The parties shall pay their own costs.
This the 9th day of May 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER